**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------------X

BRITTANY HENRY,

Plaintiff,

**Case No. 26 cv 7654**

- against -

**COMPLAINT**

HINES INTERESTS LIMITED PARTNERSHIP,

**PLAINTIFF DEMANDS A TRIAL BY JURY**

Defendant.

---------------------------------------------------------------------X

Plaintiff BRITTANY HENRY (hereinafter, "Plaintiff" or "Ms. Henry") by and through her undersigned counsel, DOLCE LAW PLLC, hereby complains of Defendant HINES INTERESTS LIMITED PARTNERSHIP (hereinafter, "Defendant" or "Hines"), based upon personal knowledge as to herself and her own acts, and upon information and belief as to all other matters, as follows:

**NATURE OF THE ACTION**

1. Plaintiff is a Black woman whose claims arise from Defendant's sustained pattern of paying her less than white comparators who shared her own internal management-level classification, denying her promotions and pay increases afforded to less experienced and less credentialed white colleagues, subjecting her to racially coded criticism and public mockery by senior leadership, and then, after Plaintiff exercised her rights to take medical leave, request disability accommodations, and complain of discrimination, retaliating against her through escalating and ultimately fabricated performance criticism that culminated in her abrupt, notice-free termination.

2. This is an action for Defendant's unlawful discrimination against Plaintiff on the basis of race, its unequal payment of wages, and its retaliation against Plaintiff for engaging in activity protected under federal, state, and city law. Defendant's conduct violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq. ("Title VII"); Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"); the FMLA; the ADA; the New York State Human Rights Law, N.Y. Exec. Law §§ 290 et seq. ("NYSHRL"); the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 et seq. ("NYCHRL"); and New York Labor Law ("NYLL") § 194. Plaintiff seeks back pay, front pay, compensatory and punitive damages, liquidated damages, declaratory and injunctive relief, attorneys' fees and costs, and all other relief available under the foregoing statutes.

**JURISDICTION AND VENUE**

3. The jurisdiction of this Court is proper under 28 U.S.C. § 1331, as this action arises under 42 U.S.C. §§ 2000e, *et seq*. (Title VII), 42 U.S.C. § 12117(a) (ADA), 29 U.S.C. § 2617 (FMLA), and 28 U.S.C. § 1343(a)(4) (Section 1981).

4. The Court has supplemental jurisdiction over all state and city law claims pursuant to 28 U.S.C. § 1367.

5. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the actions and omissions giving rise to the claims for relief occurred within this judicial district.

**PROCEDURAL PREREQUISITES**

6. On October 2, 2025, Plaintiff timely filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") alleging discrimination in violation of Title VII.

7. On December 13, 2025, Plaintiff timely amended her EEOC Charge to add claims of retaliation in violation of Title VII and the ADA.

8. On July 23, 2026, the EEOC issued Plaintiff a Notice of Right to Sue on her Charge. This Complaint is filed within ninety (90) days of Plaintiff's receipt of that Notice.

**PARTIES**

9. Plaintiff is a Black woman and a resident of the State of New York. At all times relevant, she was an "employee" entitled to protection as defined by Title VII, the FMLA, the ADA, the NYSHRL, and the NYCHRL, and NYLL § 194.

10. Defendant is a privately held real estate investment, development, and management company holding approximately $90 billion in assets under management headquartered in the State of Texas and registered to do business in the State of New York.

11. Hines is an "employer" within the meaning of Title VII, the FMLA, the ADA, the NYSHRL, the NYCHRL, and NYLL § 194, and employed Plaintiff at all times relevant to this Complaint.

**MATERIAL FACTS**

***Plaintiff's Employment History and Expanding Responsibilities***

12. Plaintiff's employment with Hines began in February 2020 as an Administrative Assistant in the Investment Management group, at a starting annual salary of $75,000. Throughout her employment with Defendant, Plaintiff worked at Defendant's New York City office.

13. Within approximately one year, in 2021, Plaintiff was promoted to Management Assistant at an annual salary of $90,000. In that role, David Steinbach, the Global Chief Investment Officer and a Managing Partner at Hines, had on multiple occasions complimented Plaintiff's work and teasingly stated he wished to "take [Plaintiff] away" from her supervisor.

14. In March 2022, after independently seeking out and competing for the position, Plaintiff transferred into the Human Resources department as Head of Office of Global Human Resources, at an annual salary of $100,000.

15. Beginning in Fall 2023, Plaintiff's clerical duties were officially delegated to a direct report so that Plaintiff could focus on associate-level Human Resources Business Partner work, including Talent Review processes, workforce planning, and succession-planning coordination for HR leadership.

16. During her tenure, Plaintiff supervised two direct reports and personally trained Arielle Ingber, Senior Manager, Global Employee Experience, and Kayla Collazo, Management Assistant, HRIS, on Hines' HR systems, processes, and ongoing initiatives.

17. In Spring 2024, Plaintiff divided her time performing Global HR responsibilities alongside Stephanie Biernbaum, Chief People Officer, and Central HR responsibilities with Nikki McGhee, HR Business Partner – Senior Director, in which capacity she managed and executed Talent Review processes, drafted and updated workforce planning materials, and served as a primary executor and resource for HR tracking systems used in leadership-level decision-making.

18. Plaintiff completed her MBA in May 2024 while continuing to perform these expanded responsibilities.

19. During this trajectory of steadily expanding responsibility, Plaintiff's compensation increased from $75,000 at hire, to $90,000 upon her September 2021 promotion, to $100,000 upon her March 2022 HR transfer, to $106,000 after her standard March 2023 merit increase, to approximately $121,000 after her subsequent 2023 market adjustment, to approximately $126,000 after her 2024 merit increase, and to approximately $129,000 by the time of her 2025

HR Specialist role. Even with those increases, Plaintiff remained underpaid relative to multiple comparators who shared her internal management-level classification, performed work of substantially similar or lesser scope, or advanced more quickly despite lesser tenure and credentials.

20. At the time of her termination on December 4, 2025, Plaintiff earned an annual salary of $129,000 as an HR Specialist employed by Defendant, together with employer-provided benefits.

***Hines' Own Internal Classification System Establishes Plaintiff's Comparators***

21. Hines maintains an internal organizational classification system that assigns each employee a "Management Level" designation independent of business title.

22. Upon information and belief, based on Hines' own internal personnel and organizational records, Plaintiff held the identical internal management-level designation, "9 Supervisor," as each of the following employees: Beth Woodman (Head of Office, Texas Tower); Kaitlin Cassidy (Executive Business Partner, West Region Office); and Rhonda Smith, also known as Rhonda El Mani-Smith (Senior Executive Assistant, West Region Office).

23. Hines' own records thus establish, independent of any characterization by Plaintiff, that Hines itself classified Plaintiff and these comparators within the same management tier of its organizational hierarchy.

24. Of the employees sharing Plaintiff's "9 Supervisor" designation, only Plaintiff and Ms. Woodman supervised a direct report.

25. Despite sharing the same internal management-level classification, and despite Plaintiff's supervisory responsibility equaling or exceeding that of Ms. Cassidy and Ms. Smith, Plaintiff was compensated at a lower rate than each of these comparators.

***The Woodman Comparator and the 2023 Compensation Dispute***

26. Ms. Woodman was hired by Hines in June 2021, more than a year after Plaintiff's February 2020 hire date, to support David Steinbach, Global Chief Investment Officer and Managing Partner.

27. At the time of her June 2021 hire, Hines offered Ms. Woodman an annual salary of $150,000, 50% more than the $100,000 Hines paid Plaintiff for a role bearing the identical "Head of Office" business title and the identical "9 Supervisor" management-level designation, beginning when Plaintiff transferred into that role in March 2022.

28. Ms. Woodman's employment with Hines ended in spring 2023. Ms. Woodman's salary at the time her employment ended would have been approximately $159,000, assuming application of standard 3% annual increases. This salary exceeded Plaintiff's March 2022 HR-transfer salary of $100,000 by approximately $59,000 and exceeded Plaintiff's later 2023 salary of $121,000 by approximately $38,000.

29. In or around March 2023, when Hines distributed annual merit increases, Plaintiff conveyed to Ms. Biernbaum that her performance over the prior year, including having assumed projects outside her formal job responsibilities, warranted a raise beyond the standard adjustment. Ms. Biernbaum responded that the firm was experiencing financial difficulty and was not broadly issuing raises, but invited Plaintiff to document her additional contributions.

30. Following that conversation, in or about May 2023, Ms. Biernbaum informed Plaintiff that her new salary would be $121,000. When Plaintiff observed that this figure did not reflect market rate given her experience and then-ongoing MBA coursework, Ms. Biernbaum told Plaintiff she "was not done learning yet," should not expect further changes in pay or title "overnight," and should be satisfied with an increase that was "nearly unheard of."

31. Plaintiff responded that the size of the increase itself indicated she had been underpaid relative to market rate since her 2022 transfer. Ms. Biernbaum ended the conversation without further response.

***Denial of Advancement and the Executive Assistant Comparators***

32. In December 2024, while performing job duties that included managing Ms. Biernbaum's correspondence, Plaintiff discovered an email establishing that Kaitlin Cassidy and Rhonda El Mani-Smith, both white women employed in Executive Assistant-type roles bearing the same "9 Supervisor" management-level designation as Plaintiff, earned substantially more than Plaintiff despite performing work of comparable or narrower scope. Ms. Cassidy earned $148,160 at the time she left Hines in 2024; Ms. El Mani-Smith earned $132,286 at the time she left Hines in 2024.

33. Unlike Ms. Cassidy and Ms. El Mani-Smith, Plaintiff's role included project management responsibility and supervision of a direct report. Upon information and belief, neither Ms. Cassidy nor Ms. El Mani-Smith supervised any direct report.

34. Ms. Cassidy and Ms. El Mani-Smith were employed in Hines' West Region office in California, a market in which, upon information and belief, compensation for similarly situated positions is equivalent to, or lower than, compensation in the New York market where Plaintiff was employed.

35. In February 2024, in anticipation of her upcoming MBA graduation and increased responsibilities, Plaintiff expressly requested a pay increase commensurate with her expanded role and educational attainment. Hines denied this request. Plaintiff nonetheless received Hines' standard companywide merit increase in March 2024, unrelated to and unresponsive to the additional increase she had specifically requested.

***Racially Coded Criticism and Public Mockery by HR Leadership***

36. During the Fall 2024 "Hines Away from Hines" program, Plaintiff traveled to London, where she met with Mary Edmunds, head of Human Resources for Europe and a member of the same HR leadership team that included Plaintiff's own supervisors.

37. At Ms. Edmunds' invitation to "sell [her]self," Plaintiff proactively raised her interest in an anticipated opening on Ms. Edmunds' team, informed Ms. Edmunds she was nearing completion of her MBA, and sought to demonstrate her qualifications for advancement.

38. In response, rather than engage with Plaintiff's qualifications, Ms. Edmunds told Plaintiff she did not want to "ever hear [Plaintiff] say 1000% ever again," stated there is "only 100%," told Plaintiff that her use of the colloquialism "did not make [her] sound intelligent," and instructed Plaintiff to "be more like Crystal," referring to Crystal Castille-Cromedy, SVP of Talent and Chief Diversity Officer, one of the few other Black members of Hines' HR leadership team.

39. Within approximately two weeks of this encounter, during a recurring HR leadership team call in which Plaintiff participated, Ms. Castille-Cromedy, while other leaders were discussing an unrelated matter, remarked that something should be "1000%, right Brittany?", laughing as she said so, with several other leaders on the call laughing along.

40. Plaintiff was embarrassed and understood herself to have been mocked, on a matter of racially coded speech criticism, in front of the senior leadership group with direct and indirect influence over her compensation, assignments, and advancement. Following this incident, Plaintiff felt uncomfortable speaking or sharing ideas freely in front of that group.

***The 2025 Restructuring, Lateral Transfer, and the Collazo Comparator***

41. Between January and March 2025, amid a company-wide restructuring involving layoffs, Ms. Biernbaum informed Plaintiff she would be reassigned to work under Margaret Spear, HR Leader for Global Finance.

42. In connection with this transition, Plaintiff trained Arielle Ingber, a white woman, to assume portions of Plaintiff's prior responsibilities. Ms. Ingber was compensated at a higher rate than Plaintiff had been while performing those same duties.

43. Ms. Biernbaum asked Plaintiff to help draft her own new job description by providing a breakdown of her duties and capabilities. Although Plaintiff had, since Fall 2023, been performing associate-level HR Business Partner work, neither Ms. Biernbaum, Ms. Spear, nor Ms. McGhee ever referred to Plaintiff's reassignment as a "promotion." Each referred to it only as a "transition," "change," or "different role."

44. In March 2025, Ms. Spear delivered Plaintiff's new job description for the newly created "HR Specialist" title and informed Plaintiff there would be no change in her compensation because her existing salary was purportedly already "at the top end of the range" for the role, notwithstanding that the HR Specialist title and its corresponding pay band did not exist prior to the 2025 restructuring and were created only after Plaintiff had already reached her then-existing compensation level.

45. Defendant did not validate Plaintiff's salary against a pre-existing, independent market standard; it created a pay band around Plaintiff's existing salary and then relied on that self-created range to deny her an increase.

46. Hines' own salary-range policy provides that salary ranges are established and updated using external market survey data, adjusted by cost-of-labor differentials, and that Human

Resources should conduct a market-price analysis for new positions or positions without formal Hines salary-range guidelines. Upon information and belief, Hines did not conduct such an independent market-price analysis for Plaintiff's newly designed HR Specialist role, and instead used Plaintiff's existing salary to define or justify the range.

47. Hines' own salary-increase policy allowed off-cycle salary increases to active employees at any time and for any amount, subject to salary-range guidelines and other listed conditions. Defendant therefore had the ability to adjust Plaintiff's compensation when her responsibilities expanded, but declined to do so.

48. In or about June 2025, Plaintiff again raised her compensation with Ms. Spear, who arranged a call with Heather Boyce, Director of Compensation.

49. During that call, on June 13, 2025, Plaintiff explained to Ms. Spear and Ms. Boyce that she had never been treated fairly at Hines with respect to compensation and advancement. Ms. Boyce responded by referring to Plaintiff's MBA as "a piece of paper" and characterizing the disparate treatment Plaintiff described as an experience that "we," meaning women, must simply endure in the corporate world.

50. Upon information and belief, in or about August 2025, Ms. Biernbaum approved the promotion of Kayla Collazo, a white woman without an advanced degree, hired by Hines in October 2022 and personally trained by Plaintiff upon her arrival, directly from Management Assistant to HR Specialist, the same position into which Plaintiff was laterally transferred without any increase in pay.

51. Ms. Collazo, a promotion and advancement comparator, advanced from Management Assistant to HR Specialist in approximately three years. Plaintiff, despite five years of tenure, progressively expanding responsibilities, and an MBA, received only a lateral transition into the

same title and no contemporaneous promotion or meaningful salary adjustment. The disparate rate of advancement between a white, less-credentialed comparator and Plaintiff, a Black woman with substantially greater experience and education, is evidence of discriminatory treatment.

***Protected Activity: FMLA Leave and the EEOC Charge***

52. In late June 2025, as a result of cumulative stress caused by the discriminatory treatment described above, Plaintiff's mental health deteriorated, and her treating clinician determined that her anxiety disorder had become progressively severe.

53. With her clinician's support, Plaintiff took approved FMLA leave beginning July 9, 2025. Her leave was subsequently extended in August 2025, with an approved return date of October 13, 2025. Plaintiff's leave continued as FMLA leave, running concurrently with New York Disability Benefits Law leave, through September 30, 2025. From October 1 through October 12, 2025, after Plaintiff's twelve-week FMLA entitlement had been exhausted, her leave continued as New York Disability Benefits Law short-term disability leave. Plaintiff returned to work on October 13, 2025.

54. Notably, upon information and belief, Ms. Spear submitted a written business-case request for a new, permanent Manager-level HR Business Partner position on July 9, 2025, the very day Plaintiff commenced FMLA leave, expressly describing the request as coinciding with, but analytically distinct from, "a three-month vacancy on the team (Brittany Henry's role)," and affirmatively representing that the request was "a net new, permanent role driven by sustained demand and business transformation, not a backfill." This contemporaneous request supports a reasonable inference that, as of July 9, 2025, Hines had not decided to eliminate Plaintiff's position, but was instead creating an additional, different position.

55. On October 2, 2025, while still on approved medical leave, Plaintiff filed her EEOC Charge alleging that Hines discriminated against her on the basis of race through unequal pay and denial of advancement opportunities.

56. Upon information and belief, in the ordinary course of EEOC procedure, Hines received notice of Plaintiff's October 2, 2025 EEOC Charge within approximately ten days of its filing, and knew of the Charge before Plaintiff's October 13, 2025 return from FMLA leave and before the adverse treatment described below began.

***Return From Leave, the Disability Accommodation Request, and the Angelle Comparator***

57. Upon returning from medical leave on October 13, 2025, Plaintiff requested reasonable accommodations for her diagnosed PTSD and ADHD, including use of noise-cancelling headphones, access to private office space as needed, and flexibility to work from home.

58. On October 16, 2025, Plaintiff submitted supporting medical documentation from her healthcare provider to Employee Relations representatives Matthew McDade and Harmony Frausto. Hines approved Plaintiff's accommodation request on October 27, 2025.

59. Immediately upon Plaintiff's return, Ms. Spear began treating Plaintiff differently than she had before Plaintiff's leave, and differently than she treated Plaintiff's colleague Mitra Angelle, a Manager – Human Resources Business Partner who had recently returned from parental leave. Ms. Spear repeatedly stated that Ms. Angelle needed "about a month" to reacclimate following her leave. Plaintiff, by contrast, was given only one week before her workload dramatically increased, and by her third week back was subjected to unreasonable deadlines and heightened scrutiny.

60. Both employees reported to Ms. Spear, returned from protected leave during the same period, and required reacclimation to active projects. Ms. Spear nevertheless afforded Ms.

Angelle approximately one month to reacclimate while sharply increasing Plaintiff's workload after one week, shortly after filing of Plaintiff's EEOC Charge.

***Escalating Retaliation and Manufactured Performance Issues***

61. Beginning in late October 2025, Ms. Spear systematically excluded Plaintiff from meetings concerning projects for which Plaintiff was the responsible subject-matter expert. On October 30, 2025, Ms. Spear excluded Plaintiff from a call regarding the Talent Review Smartsheet project, a project for which Plaintiff was the primary executor, instead contacting Plaintiff's colleague Leah English to discuss Plaintiff's own work without including Plaintiff.

62. On October 31, 2025, when Plaintiff requested to be included in meetings concerning her own assignments, Ms. Spear responded by asserting her authority to exclude Plaintiff and to have others direct Plaintiff's work without her input.

63. On November 5, 2025, merely nine days after Plaintiff's accommodation was approved, Ms. Spear misrepresented the duration of Plaintiff's approved accommodation, incorrectly telling Plaintiff that her work-from-home accommodation would expire at year-end, when Plaintiff's written approval letter stated the accommodation was effective for 90 days from October 27, 2025, through late January 2026.

64. On November 7, 2025, Ms. Spear falsely claimed that Plaintiff had missed a November 6, 2025 deadline for the Real Estate Finance Americas Talent Review deck, notwithstanding the parties' prior agreement that the deadline would be adjusted due to a client's late data submission.

65. When Plaintiff produced screenshot evidence of the parties' actual agreement, Plaintiff discovered, through the version history maintained by Hines' Box file-sharing platform, that Ms. Spear had retroactively altered the project timeline document after the parties' email exchange in order to manufacture support for her false claim.

66. On November 7, 2025, Plaintiff submitted a formal written complaint to Employee Relations, copying Ms. Spear, describing the material shift in Ms. Spear's treatment of Plaintiff that began upon Plaintiff's return from leave and her accommodation request. Employee Relations never responded to or investigated Plaintiff's complaint.

67. Throughout November 2025, Ms. Spear and Ms. Angelle imposed increasingly unreasonable demands on Plaintiff, including on November 19, 2025, Ms. Angelle's unexplained acceleration of multiple deadlines, requiring Plaintiff to work late nights and weekends; the rejection of Plaintiff's proposals and expertise while providing her impossible turnaround times; and decisions made about Plaintiff's own projects without her input, for which Plaintiff was then blamed.

68. On November 18, 2025, Ms. Spear denied Plaintiff's request to reallocate hours within a given week, after Plaintiff had already worked substantial uncompensated overtime to meet Ms. Spear's deadlines, to take a half-day on a Friday, notwithstanding that such flexibility had previously been standard practice.

69. A colleague who observed Ms. Spear's and Ms. Angelle's treatment of Plaintiff during this period independently remarked that it appeared Hines was "out to get" Plaintiff, and both Plaintiff and the colleague recognized the pattern as consistent with a practice used by Human Resources to manufacture performance issues in order to push out unwanted employees.

***Termination and Its Pretextual Justification***

70. On December 4, 2025, 63 days after Plaintiff filed her EEOC Charge, 52 days after her return from approved medical leave, 38 days after her disability accommodation was approved, and 27 days after she filed her formal internal retaliation complaint, Ms. Spear and Jay Bennett

of Employee Relations informed Plaintiff, during what was to be a regular one-on-one meeting, that her employment was terminated effective immediately.

71. Just days before this meeting, Ms. Spear had discussed with Plaintiff prospective January 2026 Talent Succession planning projects on which Plaintiff would be working. These assurances are inconsistent with any prior, final decision to eliminate Plaintiff's position.

72. Hines represented that Plaintiff's termination was a "business decision" driven by a need for "more global HR compliance experience." Though Hines acknowledged it was not a performance-based decision, the proffered reason is pretextual.

73. Neither Ms. Spear nor Ms. Angelle, the two supervisors retained in the restructured department, possessed the global HR compliance credentials Hines claims the restructured role required. Ms. Angelle did not obtain her HR management degree until 2023 and holds no global compliance certification.

74. Ms. Spear had previously told Plaintiff that global compliance was not a responsibility of their team, as Hines' European and Asian counterparts handled local-law compliance in their respective regions.

75. The Manager-level HRBP role Ms. Spear requested in her July 9, 2025 business case does not identify global compliance credentials as a threshold requirement; it emphasizes general HRBP experience and organizational-design support for the Global Center of Excellence integration, responsibilities substantially overlapping with work Plaintiff had already been performing.

76. Plaintiff had successfully completed all of her assigned Talent Review responsibilities notwithstanding the unreasonable conditions that Ms. Spear and Ms. Angelle imposed upon her following her return from leave.

***Disparate Treatment in the Termination Process***

77. Upon information and belief, other employees affected by Hines' 2025 reduction in force received between one and nine months of advance notice of termination. Plaintiff received none.

78. Plaintiff had personally helped develop and circulate the standard severance letters used for other employees affected by the restructuring. Another New York-based employee notified of termination on November 21, 2025 was given until December 24, 2025 to depart, over a month's notice.

79. Upon her termination, Plaintiff was immediately locked out of all Hines systems and expressly barred from Hines premises, a restriction communicated to building security in terms suggesting Plaintiff posed a danger. Plaintiff was also barred from attending a company holiday party to which she had already RSVP'd.

80. Plaintiff's severance agreement contained ten additional pages of restrictive provisions beyond the standard three-page agreement Plaintiff had herself helped prepare for other employees affected by the restructuring earlier in 2025.

81. Upon information and belief, within hours of Plaintiff's termination, Nikki McGhee, Plaintiff's former co-supervisor, told colleagues that she was "upset" about the termination and that "once you're no longer on my team, I can't fight for you," an admission inconsistent with the notion that the termination was a neutral business decision unrelated to any individual's advocacy or lack thereof.

82. At no point before December 4, 2025 was Plaintiff informed that her position had been eliminated or that a final decision regarding her separation had been made. To the contrary, Plaintiff continued to receive substantive work assignments and was included in discussions of

future planning throughout the fall of 2025, including discussions of January 2026 Talent Succession projects just days before her termination.

***Damages***

83. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and continues to suffer substantial economic harm, including the loss of her $129,000 annual salary, bonus eligibility, and associated employee benefits, without the notice or transition period Hines afforded to, upon information and belief, other employees affected by its restructuring.

84. As a further direct and proximate result of Defendant's conduct, Plaintiff has suffered economic harm in the form of years of suppressed compensation relative to her similarly classified comparators, denied promotional opportunities, lost career advancement, and lost future earnings trajectory as well as significant humiliation, mental anguish, emotional distress, and harm to her professional reputation and standing.

**AS A FIRST CAUSE OF ACTION**
**RACE DISCRIMINATION UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**

85. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

86. Plaintiff as a Black woman is a member of a class protected under Title VII on the basis of race.

87. Plaintiff was qualified for each position she held with Defendant.

88. Defendant subjected Plaintiff to adverse employment actions on the basis of her race, including disparate compensation and denial of promotional opportunities.

89. These adverse actions occurred under circumstances giving rise to an inference of discriminatory intent, including remarks concerning Plaintiff's race that are not shielded by the "stray remarks" doctrine.

90. As a direct and proximate result of Defendant's discriminatory conduct, Plaintiff has suffered lost wages, lost benefits, and lost promotional value, together with emotional distress, humiliation, and career harm, for which she is entitled to an award of monetary damages, as well as past and future lost wages and benefits and other compensatory damages, and other relief.

91. Defendant's unlawful discriminatory actions were undertaken with malice or reckless indifference to Plaintiff's federally protected rights, constituting a violation of Title VII for which Plaintiff is entitled to an award of punitive damages.

## AS A SECOND CAUSE OF ACTION
## RETALIATION UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

92. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

93. Plaintiff engaged in activity protected under Title VII by opposing and complaining of discrimination based on race.

94. Defendant retaliated against Plaintiff for engaging in that protected activity, culminating in her termination, in violation of Title VII.

95. As a direct and proximate result of Defendant's retaliatory conduct, Plaintiff has suffered lost wages, lost benefits, and emotional distress, for which she is entitled to an award of monetary damages, as well as past and future lost wages and benefits and other compensatory damages, and other relief.

96. Defendant's unlawful retaliatory actions were undertaken with malice or reckless indifference to Plaintiff's federally protected rights, constituting a violation of Title VII for which Plaintiff is entitled to an award of punitive damages.

**AS A THIRD CAUSE OF ACTION**
**RACE DISCRIMINATION UNDER SECTION 1981**

97. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

98. Defendant intentionally discriminated against Plaintiff on the basis of her race in the making, performance, modification, and termination of her employment contract, and in the enjoyment of all benefits, privileges, terms, and conditions of that contractual relationship, in violation of 42 U.S.C. § 1981.

99. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered economic loss, emotional distress, and harm to her career, for which she is entitled to an award of monetary damages, as well as past and future lost wages and benefits and other compensatory damages, and other relief.

100. Defendant's conduct was intentional, malicious, and undertaken with reckless or callous indifference to Plaintiff's federally protected rights, constituting a violation of Section 1981 for which Plaintiff is entitled to an award of punitive damages, unrestricted by the statutory damages cap applicable to Title VII claims.

**AS A FOURTH CAUSE OF ACTION**
**RETALIATION UNDER SECTION 1981**

101. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

102. Plaintiff engaged in activity protected under Section 1981 by complaining of race discrimination.

103. Defendant retaliated against Plaintiff for engaging in that protected activity, culminating in her termination, in violation of Section 1981.

104. As a direct and proximate result of Defendant's retaliatory conduct, Plaintiff has suffered economic loss, emotional distress, and harm to her career, for which she is entitled to an award of monetary damages, as well as past and future lost wages and benefits and other compensatory damages, and other relief.

105. Defendant's conduct was intentional, malicious, and undertaken with reckless or callous indifference to Plaintiff's federally protected rights, constituting a violation of Section 1981 for which Plaintiff is entitled to an award of punitive damages, unrestricted by the statutory damages cap applicable to Title VII claims.

**AS A FIFTH CAUSE OF ACTION**
**RETALIATION UNDER THE FAMILY AND MEDICAL LEAVE ACT**

106. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

107. At all relevant times, Plaintiff had a serious health condition within the meaning of the FMLA, was employed by a covered employer, and was entitled to FMLA-protected leave.

108. During the twelve months preceding July 9, 2025, Plaintiff worked at least 1,250 hours for Hines, and Hines employed at least 50 employees within 75 miles of Plaintiff's New York City worksite. Plaintiff was therefore an eligible employee under 29 U.S.C. § 2611(2).

109. The written request for a new Manager-level HR Business Partner position, submitted on Defendant's behalf the same day Plaintiff commenced FMLA leave and expressly referencing a vacancy in Plaintiff's role, supports an inference that Defendant's adverse treatment began with Plaintiff's FMLA-protected leave. Upon Plaintiff's return from leave, Defendant subjected her to escalating adverse treatment, culminating in her termination, in violation of the FMLA.

110. As a direct and proximate result of Defendant's retaliatory conduct, Plaintiff has suffered lost wages, benefits, and other compensation, for which she is entitled to an award of monetary

damages, as well as past and future lost wages, salary, and employment benefits, and such equitable relief as may be appropriate, as authorized by 29 U.S.C. § 2617(a)(1).

111. Plaintiff is further entitled to liquidated damages in an amount equal to her lost wages, benefits, and other compensation, plus interest.

**AS A SIXTH CAUSE OF ACTION**
**RETALIATION UNDER THE AMERICANS WITH DISABILITIES ACT**

112. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

113. Plaintiff engaged in activity protected under the ADA by requesting reasonable accommodations for her disabilities. Defendant approved accommodations.

114. Shortly after approval, Defendant misstated the duration of Plaintiff's accommodation. Together with the timing, heightened scrutiny, and subsequent adverse actions, that misstatement supports an inference of hostility toward and retaliation for Plaintiff's exercise of ADA-protected rights.

115. Defendant further subjected Plaintiff to adverse employment actions, culminating in her termination, under circumstances giving rise to an inference of retaliatory intent.

116. Defendant's stated reason for Plaintiff's termination was pretextual.

117. As a direct and proximate result of Defendant's retaliatory conduct, Plaintiff has suffered and continues to suffer economic and non-economic damages, including but not limited to lost wages and benefits, emotional distress, and damage to her professional reputation, for which she is entitled to an award of monetary damages, as well as past and future lost wages and benefits and other compensatory damages, and other relief.

118. Defendant's unlawful retaliatory actions were undertaken with malice or reckless indifference to Plaintiff's federally protected rights, constituting a violation of the ADA for which Plaintiff is entitled to an award of punitive damages.

**AS A SEVENTH CAUSE OF ACTION**
**RACE DISCRIMINATION UNDER THE NEW YORK STATE HUMAN RIGHTS LAW**

119. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

120. As amended in 2019, the NYSHRL is to be construed liberally for the accomplishment of its remedial purposes, regardless of whether federal civil rights laws, including Title VII, have been similarly construed. N.Y. Exec. Law § 300.

121. Plaintiff as a Black woman is a member of a class protected under the NYSHRL on the basis of race.

122. Defendant subjected Plaintiff to disparate pay and denial of promotional opportunities on account of her race, in violation of the NYSHRL. Defendant's conduct was willful and in reckless disregard of Plaintiff's rights under New York State law.

123. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered economic loss and emotional distress, for which she is entitled to an award of monetary damages, as well as past and future lost wages and benefits and other compensatory damages, and other relief.

124. Defendant's unlawful discriminatory actions constitute willful or wanton negligence, recklessness, or a conscious disregard of Plaintiff's rights amounting to such disregard, for which Plaintiff is entitled to an award of punitive damages.

**AS AN EIGHTH CAUSE OF ACTION**
**RETALIATION UNDER THE NEW YORK STATE HUMAN RIGHTS LAW**

125. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

126. Plaintiff engaged in protected activity under the NYSHRL by opposing and complaining of discrimination and requesting accommodations for her disabilities.

127. Defendant retaliated against Plaintiff for engaging in that protected activity, culminating in her termination, in violation of the NYSHRL.

128. As a direct and proximate result of Defendant's retaliatory conduct, Plaintiff has suffered lost wages, lost benefits, and emotional distress, for which she is entitled to an award of monetary damages, as well as past and future lost wages and benefits and other compensatory damages, and other relief.

129. Defendant's unlawful retaliatory actions constitute willful or wanton negligence, recklessness, or a conscious disregard of Plaintiff's rights amounting to such disregard, for which Plaintiff is entitled to an award of punitive damages.

**AS A NINTH CAUSE OF ACTION**
**RACE DISCRIMINATION UNDER THE NEW YORK CITY HUMAN RIGHTS LAW**

130. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

131. The NYCHRL is a remedial statute that must be construed independently and more liberally than its federal and state counterparts in favor of plaintiffs, to the extent that its language permits. Plaintiff need only show that her race was "a motivating factor" in Defendant's adverse treatment of her, or that she was treated "less well" because of a protected characteristic, standards that do not require proof of but-for causation or a materially adverse employment action.

132. Plaintiff as a Black woman is a member of a class protected under the NYCHRL on the basis of race.

133. Defendant's unequal pay and denial of advancement were motivated in whole or in part by Plaintiff's race, and Defendant treated her less well because of her race, in violation of the NYCHRL.

134. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered economic loss and emotional distress, for which she is entitled to an award of monetary damages, as well as past and future lost wages and benefits and other compensatory damages, and other relief.

135. Defendant's unlawful discriminatory actions constitute willful or wanton negligence, recklessness, or a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard, for which Plaintiff is entitled to an award of punitive damages, as well as attorneys' fees and costs, as provided by the NYCHRL.

**AS A TENTH CAUSE OF ACTION**
**RETALIATION UNDER THE NEW YORK CITY HUMAN RIGHTS LAW**

136. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

137. Plaintiff engaged in activity protected under the NYCHRL by opposing and complaining of discrimination and requesting accommodations for her disabilities. Under the NYCHRL, Plaintiff need only show that Defendant's conduct was reasonably likely to deter a person from engaging in protected activity, a standard broader than the "materially adverse" standard applicable under Title VII.

138. Defendant retaliated against Plaintiff for her protected activity, culminating in her termination, in violation of the NYCHRL.

139. As a direct and proximate result of Defendant's retaliatory conduct, Plaintiff has suffered economic loss and emotional distress, for which she is entitled to an award of monetary

damages, as well as past and future lost wages and benefits and other compensatory damages, and other relief.

140. Defendant's unlawful retaliatory actions constitute willful or wanton negligence, recklessness, or a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard, for which Plaintiff is entitled to an award of punitive damages, as well as attorneys' fees and costs, as provided by the NYCHRL.

**AS AN ELEVENTH CAUSE OF ACTION**
**UNEQUAL PAY IN VIOLATION OF NEW YORK LABOR LAW § 194**

141. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

142. NYLL § 194(1) prohibits an employer from paying an employee at a rate less than the rate paid to an employee of a different sex, race, color, or other protected status for substantially similar work, viewed as a composite of skill, effort, and responsibility, performed under similar working conditions in the same establishment, a standard broader than the "equal work" requirement under the federal Equal Pay Act and one that does not require identical job titles or duties.

143. Plaintiff, a Black woman, is within one or more protected classes covered by the statute, and each comparator identified below is outside at least one of those same protected classes.

144. Plaintiff's claim covers the six-year period preceding the filing of this Complaint pursuant to NYLL § 198(3). Each paycheck Defendant issued to Plaintiff at a disparate rate constitutes a separate and discrete violation, and Plaintiff is entitled to recover for each such violation occurring within that six-year period.

145. Upon information and belief, Defendant's compensation decisions for Plaintiff and her comparators were made or approved centrally, using a single company-wide management-level

classification system and centralized market-survey-based salary ranges applied uniformly across Defendant's offices.

146. This centralized system establishes Defendant's uniform compensation practices and its knowledge that Plaintiff was paid substantially less than comparators sharing her internal management-level classification who were outside her protected class.

147. At least one comparator outside Plaintiff's protected class assumed substantial portions of Plaintiff's prior duties, performs that work at the same establishment, and is paid more than Plaintiff was paid for it. This cause of action relies solely on comparators employed at Defendant's New York establishment and does not rely on employees located outside of New York.

148. Plaintiff is informed and believes that, at one or more points during her employment, at least one employee outside her protected class(es) worked at Defendant's New York office in an administrative or HR-support role performing substantially similar duties to those Plaintiff performed, under the same centralized compensation structure, and was paid more than Plaintiff for that work. This individual's identity, classification, exact compensation, and the specific period of overlap with Plaintiff's tenure are within Defendant's exclusive possession and are expected to be established through discovery.

149. Defendant's violations were willful, or at minimum not in good faith. Plaintiff raised compensation concerns internally on multiple occasions well before filing her EEOC Charge, and Defendant knew or should have known from its own centralized records that Plaintiff was underpaid relative to same-establishment comparators outside her protected class, yet took no corrective action.

150. As a direct and proximate result, Plaintiff has suffered lost wages in amounts to be proven at trial and, given Defendant's willfulness, is entitled to liquidated damages of up to 300% of wages due, prejudgment interest, attorneys' fees, and costs pursuant to NYLL § 198.

## JURY DEMAND

151. Plaintiff Brittany Henry hereby demands trial by jury on all issues so triable.

**WHEREFORE,** Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendant, and award the following relief:

A. A declaratory judgment that Defendant's conduct, as alleged herein, violated Title VII, Section 1981, the FMLA, the ADA, NYLL § 194, the NYSHRL, and the NYCHRL;

B. Injunctive relief requiring Defendant to implement appropriate policies, training, and monitoring procedures to prevent future discrimination, retaliation, and unequal pay;

C. Back pay, including lost wages, salary, bonuses, and all benefits from the date of each discriminatory, retaliatory, or unequal-pay violation through the date of judgment, including but not limited to the loss of Plaintiff's $129,000 annual salary;

D. Front pay representing the loss of future earnings and employment benefits Plaintiff would have received but for Defendant's unlawful conduct;

E. The full compensation differential between Plaintiff's earnings and those of the same-establishment New York comparators, pursuant to NYLL § 194, together with liquidated damages of up to 300% of any underpayment found to be due, pursuant to NYLL § 198;

F. Compensation for denied promotional opportunities and the lost compensation differential resulting from Defendant's discriminatory failure to advance Plaintiff on the same trajectory as her comparators;

G. Compensatory damages for emotional distress, mental anguish, humiliation, and harm to

Plaintiff's professional reputation caused by Defendant's unlawful conduct;

H. Punitive damages, given that Defendant's conduct was willful, intentional, and in reckless disregard of Plaintiff's federally and locally protected rights;

I. Reasonable attorneys' fees and costs pursuant to Title VII, the ADA, the FMLA, Section 1981, NYLL § 198, the NYSHRL, and the NYCHRL;

J. Pre- and post-judgment interest; and

K. Such other and further relief as the Court deems just and proper.

Dated: Brooklyn, New York
September 7, 2026

**DOLCE LAW PLLC**

By: ______________________

Wendy Dolce
*Attorneys for Plaintiff*
44 Court Street, Suite 1217
Brooklyn, New York 11201
(718) 571-9162
wendy@dolcelaw.com